# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| Nautilus Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:22-cv-00064 |
| | ) | |
| Keave W. Bayes, Craig Rutland, and Kenneth Darrell Andrews, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Prepared by R. Bryan Tilden, CPCU, CLU, ARM, ALCM, ChFC, CIC, SCLA
TILDEN AND ASSOCIATES
Pittsboro, North Carolina
September 15, 2022

1

# PREFACE

I, R. Bryan Tilden, offer the following report containing a statement of my opinions and the basis and reasons thereof, the data or other information considered in forming the opinions, my qualifications, and the compensation I am to be paid.

I have been retained by Sanford W. Thompson, IV, and John Paul Godwin, to review certain materials and to, in summary, provide my expert opinions relating to the adjustment of a loss, all as described in detail in this report.

I have over 48 years of experience in the insurance and risk management industry as an author, agent, broker, consultant, underwriter, drafter of policy forms and endorsements, teacher, historian, claim examiner, and consultant for both the insured and insurers. As a broker representing the insured, I have placed accounts in the international insurance market, including coordinated placements with Lloyd's brokers, Lloyd's syndicates, United States, Canadian, British, and European insurance companies. I have worked with Lloyd's brokers, Lloyd's syndicates, United States, Canadian, British, Bermudian, and European companies in the drafting, underwriting, and placement of insurance policies marine and non-marine, and the adjustment of property and liability losses. I teach the construction, drafting, underwriting, adjusting, and analysis of insurance policies throughout the United States, Canada, Mexico, the Caribbean, Bermuda, and the European Union. I have testified in the United States and London regarding the above subject matters. I am familiar with the international insurance and domestic marketplace's custom and practices, including the London, European, Caribbean, Canadian, Bermudian, and United States markets.

2

While an employee of the Independent Insurance Agents of North Carolina, Inc. ("IIANC"), I served as the Director of Education and Director of Technical Affairs during my tenure there. I worked, before joining IIANC and also as a staff member of IIANC, with the North Carolina Department of Insurance ("NCDOI") and the North Carolina Legislature in helping promulgate and implement the North Carolina Pre-Licensing programs for insurance agents and Continuing Education for insurance agents and adjusters. After these programs were statutorily and administratively authorized, I worked with the NCDOI on the content outline for testing of agents and adjusters, developed exam questions, and sat on the cut score committee to validate the licensing exams. North Carolina General Statute 58-63-15, 20, and 50 was and is included in the pre-licensing and testing for all licensees, with particular emphasis on 58-63-15(11) on the North Carolina Adjuster Exam. The North Carolina General Statute 58-63-15 follows the model National Association of Insurance Commissioners' Models.

I am not an attorney, and nothing in this report should be construed as a legal opinion in any way. My opinions are based on customs and practices in the insurance industry that come to bear on this matter. At the same time, it is not possible to review the handling of matters without reference to industry rules, regulations, policy terms and conditions, the claimed loss, and the transactions at issue. If any of the terminology or concepts used in this report has any overlap or congruence with legal terms, please be aware that the terms are not being used as legal terms; rather, they are used as terms of art within the insurance industry which are commonly used and understood in the industry.

My curriculum vitae is attached hereto as Exhibit A. I prepared this report after reviewing the documents listed below. My billing rate for consulting expert and expert witness work is $300

3

an hour.[1]  Because discovery is ongoing, and because I have been informed by counsel that portions of the transcript from the trial in Johnston County are being transcribed, I reserve the right to supplement or amend this report based on the new information.  These are my opinions to a reasonable degree of professional certainty.

## DOCUMENTS PROVIDED

1. Complaint with Exhibits;

2. Answer and Counterclaim with Exhibits;

3. Nautilus Insurance Company Reply;

4. Bayes Initial Disclosures;

5. *Keave W. Bayes v. Kenneth Darrell Andrews, Carolina Forest Products, Inc., and Craig Rutland,* 20-cvs-001358, Superior Court, Johnston County, North Carolina;

    a. Answer;

    b. Pre-Trial Order;

    c. Judgment;

6. Keave Bayes Objections and Answers to Plaintiff's First Set of Interrogatories;

7. Keave Bayes Objection and Answers to Plaintiff's First Set of Requests for Production of Documents including Plaintiff's Exhibits 28, 31, 64, 65, 66, 67, 68, 71, 72, 73, 74;

---

[1] No portion of my compensation is dependent upon the result of this litigation.

4

8. Certificate of Title for 1993 Frht Tr VIN 1FUYDZYB5PH496449;

9. Deposition of Craig Neill Rutland including Plaintiff's Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9 10, 11;

10. Deposition of Keave W. Bayes;

11. Deposition of Kenneth Darrell Andrews, including Plaintiff's Exhibit 12 and 13;

12. Nautilus Reservation of Rights Letters dated:

   a. April 17, 2018;

   b. September 6, 2018;

   c. February 28, 2020;

   d. June 8, 2020:

      i. Craig Rutland;

      ii. Kenneth Darrell Andrews;

13. Plaintiff's Rule 26(A)(1) Disclosures;

14. Trial Exhibits Bayes 22, 27, 34, 35, 37, 40; and

15. Unredacted portions of Nautilus Document Production, approximately 250 pages out of approximately 3,500.

# BACKGROUND

*Underlying Claim*

The incident occurred on February 14, 2018, in Moore County.[2]

Mr. Bayes was a truck driver and never ran any forestry equipment on the Guy Tract.[3] Mr. Bayes was self-employed.[4] Truck drivers are not loggers or lumberers.[5] Mr. Bayes was a contract log hauler.[6] Mr. Bayes hauled timber for different companies.[7] The insured stated that he paid truckers based upon mileage and reports the earnings to the IRS via a 1099.[8]

Mr. Bayes owned his truck and took care of maintaining it, buying fuel, and paying his insurance. He was only paid when he hauled a load; he was not paid when he drove to pick up a load, when he drove back after unloading, or when he drove home. He was not paid by Craig Rutland on the day he was injured because he did not haul the wood.[9]

Mr. Bayes was not running any of the logging equipment at the tract.[10] Mr. Andrews was operating the 2384 Prentice knuckle-boom loader.[11] The knuckle-boom loader was mounted on a trailer, with the outriggers deployed so it would not move.[12] At the time of the accident, the knuckle-boom loader was not attached to an auto.[13]

---

[2] Nautilus 001006.
[3] Depositions of Kenneth Darrell Andrews, 10:2 – 9; Keave W. Bayes 175:15 – 176:11; Craig Neill Rutland 51:17 0 52:22; Stipulations in Pre- Trial Order.
[4] Deposition of Keave W. Bayes, 10:14 – 18; Nautilus 001541.
[5] Deposition of Craig Neill Rutland, 82:14 – 16, 87:1 – 17.
[6] Deposition of Craig Neill Rutland, 9:9 – 11.
[7] Nautilus 001541.
[8] Nautilus 001541.
[9] Bayes Answers to Nautilus Interrogatories 7 and 9.
[10] Deposition of Craig Neill Rutland, 51:17 – 52:22; Deposition of Keave W. Bayes, 175:15 – 176:11.
[11] Deposition of Kenneth Darrell Andrews, 13:18 – 24.
[12] Deposition of Kenneth Darrell Andrews, 13:25 – 14:14; Deposition of Craig Neill Rutland, 18:8 – 12.
[13] Deposition of Kenneth Darrell Andrews, 14:15 – 17.

Nautilus assigned the claim to Custard Insurance Adjusters ("Custard"), requesting an interview with the named insured Mr. Rutland, and his employee, take pictures/videos and reenact the scene with the same loader and a truck and trailer combo similar to the claimant's.[14] Custard received the assignment from Nautilus April 6, 2018.[15] Custard met with the insured on April 10, 2018, at a new worksite.[16] On April 14, 2018, Custard closed their file.[17] On April 23, 2018, Ruth Burseth, Claims Examiner for Nautilus, queried whether Mr. Bayes was an employee, independent contractor, or employee of an independent contractor.[18]

On May 2, 2018, Nautilus requested Custard to obtain an in-person statement from the insured and the employee who was operating the loader and ask how Mr. Bayes was paid.[19] On June 27, 2018, Custard received a phone call from the loader operator who provided a brief addition to his previous recorded statement.[20] On July 16, 2018, Custard met with the insured and obtained his recorded statement.[21]

On August 23, 2018, Custard provided the load tickets to Nautilus received on July 31, 2018, for Mr. Rutland's loads transported between December 28, 2017, and June 10, 2018.[22] There were eight load tickets for Mr. Bayes, but there was no load ticket for Mr. Bayes for the date of loss, February 14, 2018.

---

[14] Nautilus 002965.
[15] Nautilus 001005.
[16] Nautilus 001006.
[17] Nautilus 002966.
[18] Nautilus 001014.
[19] Nautilus 002354 – Nautilus 002355.
[20] Nautilus 001453.
[21] Nautilus 001540.
[22] Nautilus 002889 – Nautilus 002890.

7

*Coverage Investigation*

Most of the Nautilus document production has been redacted, and neither the liability claim file nor the coverage claim file was produced so it is impossible to review the claim files and comment on the specific coverage investigation. Because the Nautilus coverage analysis was not provided, it was necessary to conduct an analysis based on the documents provided. There was "bodily injury" during the policy period caused by an "occurrence" in the "coverage territory." Nautilus, in its April 25 [17], 2018, Reservation of Rights letter, acknowledges that the policy is triggered.

There are two insureds under the policy, Mr. Rutland, the First Named Insured[23] and Mr. Andrews, who operated the loader. Mr. Andrews qualifies as an insured as an "employee" of Mr. Rutland.[24]

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

Because there are two insureds, a policy condition must be considered. Condition 7., Separation of Insureds,[25] requires that the coverage investigation be conducted as each insured being the only insured under the policy.

To be clear, only one limit of insurance applies for both insureds. The condition of one occurrence limit applying was referenced in the June 8, 2020, mirror reservation of rights letters

---

[23] Nautilus 003083.
[24] Nautilus 003094, Nautilus 003097.
[25] Nautilus 003097.

8

to Mr. Rutland and Mr. Andrews from Phelps Dunbar.  I could not find in the unredacted file that any coverage investigation was done separately for Mr. Rutland and then Mr. Andrews.

In continuing with the first reservation of rights letter of April 17, 2018, Nautilus references the Unmanned Aircraft Exclusion, CG 21 09.[26]  This exclusion replaces the Commercial General Liability ("CGL") policy Exclusion G., Aircraft, Auto or Watercraft.[27]  The reliance on this exclusion appears throughout the series of Reservation of Rights letters.

From a historical standpoint, the origin of CGL Exclusion G. first appeared in the 1955 edition.  In that edition, the exclusion began with "except for the actions of an independent contractor," autos etc. were excluded.  In the 1966 edition of the CGL, the exclusion was revised to the current form, that the auto had to be owned, operated, rented or loaned to an insured, including "loading and unloading."

Nautilus, in the reservation of rights letters, acknowledged that Mr. Bayes was injured while the trailer was being loaded.  They also referenced the owned, operated, rented or loaned to an insured qualification for the exclusion to apply.  Nautilus did not, however, discuss how the definition of "loading and unloading"[28] would apply to the facts in this claim.

---

[26] Nautilus 003103 – Nautilus 003104.
[27] Nautilus 003089.
[28] Nautilus 003098.

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, water-craft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

Loading and unloading, as a definition in the CGL and an exclusion in the Business Auto Policy ("BAP") are mirrors. As understood by the insurance industry, loading and unloading is covered under the BAP on a "completed operations" theory, as opposed to an "at rest" theory. The BAP exclusion is a definitional exclusion, in that it excludes loading before the loading begins, and excludes unloading after the property reaches its final resting place. The CGL definition of loading and unloading, which is excluded, mirrors the BAP in this respect.

The BAP has an exclusion that immediately follows the loading and unloading exclusion, entitled Movement of Property by a Mechanical Device. As an example, a conveyor belt or fork lift ("mobile equipment") would be mechanical devices, and covered under the CGL due to the exception in the definition of "loading and unloading." The BAP exclusion also makes it clear that if the mechanical device is attached to the "auto," then that coverage remains under the BAP. Examples would be a power lift gate on a truck or a boom unloading building materials. Again, the exception to CGL definition of "loading or unloading" recognizes that unless the mechanical device is attached to the auto, it is not within the definition.

In this case, Nautilus, because of the Custard documents, knew that the loader was not attached to an "auto." However, even knowing that the loader was not attached to an "auto,"

Nautilus asserted that the CGL may exclude the loss. In addition, Nautilus knew that Mr. Bayes was an independent contractor and the owner of the truck, and still asserted that exclusion as respects "autos," which would apply only if an "auto" was owned, operated, rented or loaned to an insured. In my review of the documents, this exclusion would not apply, and was incorrectly asserted.

The second exclusion that Nautilus asserts is the Exclusion – Injury to Employees, Contractors, Volunteers and Other Workers.[29] This exclusion replaces Exclusion c. in the CGL, and endorsements such as this can be traced to New York Labor Law. New York Labor Law predates workers compensation as a remedy for workplace injuries, and by statute holds the building owner responsible for workplace injuries. The endorsement states:

e. **Injury to Employees, Contractors, Volunteers and Other Workers**
"Bodily injury" to:
(1) "Employees", "leased workers", "temporary workers", "volunteer workers", statutory "employees", casual workers, seasonal workers, contractors, subcontractors, or independent contractors of any insured; or
(2) Any insured's contractors', subcontractors', or independent contractors' "employees", "leased workers", "temporary workers", "volunteer workers", statutory "employees", casual workers, seasonal workers, contractors, subcontractors, or independent contractors
arising out of and in the course of:
(a) Employment by any insured; or
(b) Directly or indirectly performing duties related to the conduct of any insured's business; or

The record shows that Mr. Bayes was an independent contractor, and independent contractor is referenced in the exclusion. The qualification for the exclusion is (a) employment by any insured, or (b) performing duties related to the conduct of the insured's business. Based on the record that I have reviewed Mr. Bayes was not employed by Mr. Rutlidge. The analysis then falls to the conduct of the insured's business.

---

[29] Nautilus 003118.

The Nautilus Common Policy Declarations state:[30]

**Policy Period:** From 11/12/2015 to 11/12/2016 at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** LOGGING        Tax State NC

**Form of Business:** X Individual    ⌐ Partnership    ⌐ Joint Venture    ⌐ Trust    ⌐ Limited Liability Company (LLC)
           ⌐ Organization, including a Corporation (but not including a Partnership, Joint Venture or LLC)

The Nautilus Commercial General Liability Policy Declarations states, with "P" being the premium base of payroll:

| CODE # - | CLASSIFICATION | * |
|---|---|---|
| 97111 - | LOGGING & LUMBERING– INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | P |
| 90638 | TIMBER OVERCUT | P |
| 90638 | OVERCUT COVER CODE | F |
| - | | |

The United States insurance industry in 1986 changed how an exposure was to be rated to reflect an inflation sensitive exposure base. Prior to that revision, CGL policies were rated based upon, as example, square footage, which did not reflect the impact or inflation. By using payroll as an exposure base, as payroll increases due to inflation, so will the final premium. Mr. Bayes, as an independent contractor, would not be included in the payroll exposure base.

---

[30] Nautilus 003083.

12

Nautilus' policy included an endorsement, Logging or Lumbering, L101, which included a definition of Logging or Lumbering.[31]  The endorsement states:

**7. DEFINITIONS:**

"**Logging or Lumbering**" means any operations associated with, or necessary or incidental to the felling, cutting, destruction, preparing or selling of timberland, timber, or lumber.  Operations include but are not limited to:

- Operating a sawing or planing mill;
- Ownership, maintenance or use of equipment or vehicle(s) used in the felling, cutting, preparing, moving or removing of timberland, timber, or the production of lumber or pulpwood other than the ownership, operation, maintenance or use of an "auto";
- Production of lumber or pulpwood;
- Road building;
- Surveying;
- Spraying, fumigating, or fertilizing; or,
- Trimming, pruning, or girdling of timberland or timber.

This definition was not discussed in any of the Reservation of Rights letters.  The endorsement states that the ownership, operation, maintenance or use of an "auto" is not "logging or lumbering."  It should be noted that "other than the ownership, operation, maintenance or use of an 'auto'" does not include the qualifier "owned, operated, rented or loaned to an insured" previously discussed in the Unmanned Aircraft Exclusion, CG 21 09.[32]

Mr. Bayes was injured while his trailer was being loaded.  Mr. Bayes owned his truck, and his truck met the definition of "auto" in the CGL policy.  By definition, Mr. Bayes as the owner and operator of his truck was not "logging or lumbering" when he was injured.  Mr. Andrews testified in his deposition that truck driving is not logging or lumbering.[33]  Mr. Rutland testified in his deposition that truck drivers are not loggers or lumberers, and that Mr. Bayes was not a logger and never did any logging or lumbering in the time Mr. Rutland knew him.[34]  It was also stipulated

---

[31] Nautilus 003113 – Nautilus 003116.
[32] Nautilus 003103 – Nautilus 003104.
[33] Deposition of Kenneth Darrell Andrews, 10:2 – 9.
[34] Deposition of Craig Neill Rutland, 52:9 – 22, 82:14 – 16; 87:1 – 17.

13

in the Pre- Trial Order that Keave Bayes did not cut or load any wood or operate logging machines on the Guy Tract.

The Exclusion – Injury to Employees, Contractors, Volunteers and Other Workers[35] states, in part, that his injuries must arise from the conduct of the insured's business. Nautilus chose to describe Craig Rutland's business description on the Common Policy Declarations as "Logging." The policy definition of "Logging or Lumbering" states that ownership, operation, maintenance or use of an "auto" is not "logging or lumbering." As to both insureds, Mr. Rutlidge and Mr. Andrews, in my opinion the exclusion does not apply.

Additionally, the CGL policy under who is an insured, raises a coverage question. Mr. Andrews, who was an employee, qualifies as an insured subject to certain exclusion. The Nautilus policy states:[36]

> 2. Each of the following is also an insured:
>
> a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:
>
> (1) "Bodily injury" or "personal and advertising injury":
>
> (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

---

[35] Nautilus 003118.
[36] Nautilus 003094.

While Mr. Andrews qualifies as an insured, the policy excludes injuries to a co-"employee."[37] As Mr. Bayes as established by the record was an independent contractor and not a co-"employee," that exclusion would not apply. This particular issue was not raised in any reservation of rights letters to Mr. Andrews.

In comparing the exclusion to a co-"employee" to the Exclusion – Injury to Employees, Contractors, Volunteers and Other Workers,[38] that endorsement did not modify the co-"employee" exclusion in Who Is An Insured, "Employees." While not agreeing that the Endorsement excludes coverage for Mr. Rutlidge and Mr. Andrews, there is not any mention of the conflicting exclusionary wording in the CGL where as respects Mr. Andrews, there is a narrower exclusion. As a claims examiner, it would be custom and practice to point this out to coverage council to resolve the conflicting exclusionary wording.

## **OPINIONS**

*1. Overview*

My fundamental opinion is that Nautilus failed to meet the standard of care expected of an insurance company adjusting a claim. In considering the various claims handling custom and practices, the record demonstrates ample examples of failing to comply with reasonable and commercially acceptable standards for acting in the best interest of Nautilus' insureds, Mr. Rutland and Mr. Andrews. Nautilus' redaction of the majority of its claim file raises the question of a pre-disposition to avoid payment rather than to find coverage where available. Below, I set forth a non-exhaustive list of the claims handling failures and deficiencies by Endurance.

---

[37] Nautilus 003094.
[38] Nautilus 003118.

## 2. *Insurance Industry Custom and Practices*

All parties to an insurance contract are expected to be ethical in their dealings. That is why insurance contracts are referred to as contracts "of utmost good faith" (in Latin, *uberrimae fidei).* "*It is to the insured that the insurance company owes the contractual obligation of utmost good faith and fair dealing.*"[39]

With regards to the origins of insurance industry standards, there are standards that have been developed by the industry over many years that apply to claims handling – requiring among other things prompt and efficient processing of a claim, honesty, and candor, and a thorough and timely investigation.[40] My review of North Carolina General Statute 58-63-15 reveals that the statutory claims handling standards are consistent with well-founded industry standards for claims handling. Here, the claim was not adequately adjusted per these settled claims handling standards.

## 3. *Deficient Claim File*

"*The primary duty of the claim representative is to deliver the promise to pay. Therefore, the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims.*" "*Because of the personal relationship formed in an insurance transaction, the insurance company should not place its interests above the insured's.*" "*The claim professional handling claims should honor the company's obligations under the implied covenant of good faith and fair dealings.*"[41]

Without being able to review the entirety of Nautilus' actual claim file as the majority was redacted, I am unable to determine if there was any real coverage analysis. In preparation for this

---

[39] James J. Markham*, The Claims Environment* (Malvern: The Insurance Institute, 1993) p. 18. Doris Hoopes*, The Claims Environment, 2nd ed.* (Malvern: The Insurance Institute, 2000) p. 10.4.
[40] Doris Hoopes*, The Claims Environment, 2nd ed.* (Malvern: The Insurance Institute, 2000) p. 2.3.
[41] James J. Markham*, The Claims Environment* (Malvern: The Insurance Institute, 1993) p. 13.

16

report, I had to develop large parts of the claim file from the Court documents and the Custard Insurance Adjuster reports from the unredacted portion of the Nautilus document production. By not being able to follow the coverage investigation due to redactions, it becomes impossible to determine if there was a full and fair coverage analysis. Claims analysis, along with claims records, is something that one would customarily find in an insurance company's claim file.

4. *Investigation of Liability and Coverage*

"*An investigation must often be undertaken to fully develop the facts needed to determine coverage. Good faith claim practices require that this investigation be objective, thorough, and timely.*"[42]

When an insured or a claimant presents a claim, it is generally the custom and practice of the insurance industry to determine whether to confirm or deny coverage.[43] In most cases, claims are clearly covered. But if coverage is doubtful, the adjuster must *promptly* recognize, call attention to and begin to resolve any potential coverage problems.

In this case, Nautilus failed to recognize that there were two insureds, by directing the Reservation of Rights letters solely to Mr. Rutland for approximately two years. While acknowledging that the insuring agreement was triggered in its April 25, 2018, letter, it was not until June 8, 2020, that there was any communication to Mr. Andrews. This is notable because all other reservation of rights letters (April 25 [17], 2018 as both dates were on the letter, September 6, 2018, and February 28, 2020) were addressed solely to Mr. Rutland.

---

[42] James J. Markham, *The Claims Environment* (Malvern: The Insurance Institute, 1993) p. 29. Doris Hoopes*, The Claims Environment, 2nd ed.* (Malvern: The Insurance Institute, 2000) p. 10.6.
[43] Doris Hoopes*, The Claims Environment, 2nd ed.* (Malvern: The Insurance Institute, 2000) p. 2.1.

And based on my review, Mr. Rutland and Mr. Andrews provided everything that Nautilus reasonably needed to provide its coverage position. The recorded statements and documentation Mr. Rutland and Mr. Andrews provided Nautilus through Custard were specific in nature so that an insurance company could make a coverage determination and initial assessment of the claim.

5. *Misstated Policy Provisions*

"*Insureds purchase insurance to pay for losses, for peace of mind, and to benefit society by reducing social burdens. When insurers do not provide those benefits of insurance, they cause just the opposite: unpaid losses, great stress, and burdens on society*."[44] "*Claim service includes prompt and courteous conduct, good communication, and prompt payment.*"[45]

Claims handlers should carefully review the terms and conditions of their policies, and communicate those terms fairly and accurately to their insureds. In North Carolina, it is an unfair claims settlement practice for an insurer to "[m]isrepresent[ ] pertinent facts or pertinent policy provisions related to coverages at issue."[46] Here, Nautilus did not communicate its policy provisions accurately.

Nautilus should not misstate terms and conditions to a policyholder. In the custom and practice of the insurance industry, it is understood that the insurance company is generally in a better position than its insured to understand and explain the insurance coverage terms and conditions.

---

[44] Doris Hoopes*, The Claims Environment, 2nd ed.* (Malvern: The Insurance Institute, 2000) p. 9.2.
[45] Doris Hoopes*, The Claims Environment, 2nd ed.* (Malvern: The Insurance Institute, 2000) p. 12.1.
[46] NCGS 58-63-15(11)(a).

*"The primary duty of the claim representative is to deliver the promise to pay. Therefore, the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims."[47]*

Nautilus should have provided Mr. Rutland and Mr. Andrews with clear communications in relation to Mr. Bayes claim.

Nautilus' rush to find exclusionary language rather than carefully evaluate coverage for Mr. Rutland and Mr. Andrews falls well short of the customary industry practices for claims handling.

As an initial matter, Nautilus rushed to exclude coverage based on an incorrect analysis of the Unmanned Aircraft Exclusion, CG 21 09.[48] By July 25, 2018, Nautilus knew that Mr. Bayes was an independent contractor, that the truck was not owned by Mr. Rutledge or Mr. Andrews, and was being loaded by a mechanical device not attached to an "auto." In spite of this, Nautilus has asserted that this exclusion applies.

Secondly, it was not until two years after the loss that Nautilus even communicated with Mr. Andrews, their insured, its coverage position. Even though Nautilus knew the facts, it still insisted on asserting the Unmanned Aircraft Exclusion, CG 21 09.

Nautilus, in its haste to deny coverage, failed to reconcile the exclusionary differences between an employee not having coverage for injury to a co-"employee" and the Exclusion – Injury to Employees, Contractors, Volunteers and Other Workers.[49]

---

[47] James J. Markham, *The Claims Environment* (Malvern: The Insurance Institute, 1993) p. 13.
[48] Nautilus 003103 – Nautilus 003104.
[49] Nautilus 003118.

Additionally, Nautilus failed to reference in any reservation of rights letter that the policy had a definition of "logging or lumbering" that stated that ownership, operation, maintenance or use of an "auto" is not "logging or lumbering." Thus, Mr. Bayes was not performing a duty of the business Nautilus chose for this policy, "Logging & Lumbering." In spite of this, Nautilus has asserted that this exclusion applies.

*6. Nautilus Reservation of Rights Letters did Not Set Forth Facts to Support Applying Exclusions or Otherwise Deny Coverage*

In the custom and practice of the insurance industry, a reservation of rights letter should be unambiguous. In the reservation of rights letters reviewed, Nautilus identified the policy at issue and quoted policy provisions, terms, conditions, and exclusions, with a qualifier that they may bar coverage. Even after Nautilus had information supporting the exclusion would not apply, Nautilus continued to assert the exclusion.

The problem in reading the letters is they did not tie the policy provisions together and set forth the specific facts that are relevant to support a potential lack of coverage based on the cited policy provision. To fairly inform the insured of the insurer's position it is not enough just to list the facts, even in detail, and then separately list a bunch of policy provisions.

As an example, Nautilus on June 8, 2020, for the first time asserted the Expected or Intended Injury Exclusion, without explanation, or tying the exclusion to any fact that would give rise to this exclusion. In addition, the exclusion is singular to "the insured." Nautilus did not specify which of the two insureds, Mr. Rutland or Mr. Andrews, intentionally injured Mr. Bayes.

20

Nautilus, as previously discussed, did not include any provision of the policy that may have provided unambiguous analysis to either insured. Nautilus omitted a discussion of the definition "Logging and Lumbering" to explain the scope of the insured's business as it relates to an exclusion. Instead, Nautilus simply stated that injuries to independent contractors are excluded.

*Conclusion*

The opinions outlined in this report by me are stated to a reasonable degree of professional certainty.

R. Bryan Tilden
CPCU, CLU, ARM, ALCM, ChFC, CIC

21